No. 22-35764

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

CASCADIA WILDLANDS, THE CENTER FOR BIOLOGICAL DIVERSITY,
and AUDOBON SOCIETY OF PORTLAND,

Plaintiffs-Appellees,

v.

SCOTT TIMBER CO., ROSEBURG RESOURCES CO., and
RLC INDUSTRIES CO.,

Defendants-Appellants.

---

On Appeal from the United States District Court for the District of Oregon,
Case No. 6:16-cv-01710-AA, Hon. Ann L. Aiken

---

## OREGON FOREST INDUSTRIES COUNCIL'S *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

---

David O. Bechtold, OSB No. 133019
Northwest Resource Law PLLC
1500 S.W. First Avenue, Suite 985
Portland, OR 97201
503.664.3582
dbechtold@nwresourcelaw.com

Greg A. Hibbard, OSB No. 183602
Northwest Resource Law PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1568
ghibbard@nwresourcelaw.com

Attorneys for *Amicus Curiae* Oregon Forest Industries Council

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1(a), the undersigned counsel for *amicus curiae* states that the Oregon Forest Industries Council, an Oregon nonprofit corporation, has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock.

Dated this 10th day of April, 2023.

Respectfully submitted,

*s/ David O. Bechtold*
David O. Bechtold, OSB No. 133019

Attorney for *Amicus Curiae* Oregon
Forest Industries Council

# TABLE OF CONTENTS

I.  IDENTITY AND INTERESTS OF *AMICUS CURIAE* AND SOURCE OF

    AUTHORITY ................................................................................1

II.  SUMMARY OF ARGUMENT.....................................................6

III.  ARGUMENT ...........................................................................11

    A. A Holistic View of the ESA Is Required to Understand How Habitat and

       Individual Members of a Species Are Addressed Differently. ...............12

    B. The Standard for Proving Harm from Habitat Modification. .................16

    C. Critical Flaws in the District Court's Approach and Findings................21

    D. The Court Applied the Wrong Evidentiary Standard..............................25

    E. The Court Must Not Endorse the Practice of Broad Anticipatory Citizen

       Suit Notices.............................................................................26

IV.  CONCLUSION ..........................................................................28

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,

 772 F.3d 592 (9th Cir. 2014)..................................................................26

*American Bald Eagle v. Bhatti,*

 9 F.3d 163 (1st Cir. 1993) ..................................................................7

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,

 515 U.S. 687 (1995) ........................................................ passim

*Coal. for a Sustainable Delta v. John McCamman*,

 725 F. Supp. 2d 1162 (E.D. Cal. 2010)..................................................16

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

 698 F.3d 1101 (9th Cir. 2012)..............................................................14

*Forest Conservation Council v. Rosboro Lumber Co.*,

 50 F.3d 781 (9th Cir. 1995)............................................................7, 16

*Friends of Animals v. Ashe*,

 808 F.3d 900 (D.C. Cir. 2015) ............................................................26

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*,

 797 F.3d 645 (9th Cir. 2015)..............................................................26

*Marbled Murrelet v. Babbitt*,

 83 F.3d 1060 (9th Cir. 1996), *as amended on denial of reh'g,* (June 26, 1996)

 ................................................................................ passim

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency,*

    38 F.4th 34 (9th Cir. 2022) ....................................................................14

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*

    551 U.S. 644 (2007) ............................................................................14

*Nat'l Wildlife Fed'n v. Burlington N. R.R.,*

    23 F.3d 1508 (9th Cir. 1994) ................................................................7

*Pac. Coast Fed'n of Fishermen's Associations v. U.S. Bureau of Reclamation,*

    426 F.3d 1082 (9th Cir. 2005) ............................................................14

*Tennessee Valley Auth. v. Hill,*

    437 U.S. 153 (1978) ............................................................................14

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*

    139 S. Ct. 361 (2018) ..........................................................................13

**Statutes**

16 U.S.C. § 1532 ......................................................................................6

16 U.S.C. § 1533 ....................................................................................12

16 U.S.C. § 1536 .................................................................... 7, 12, 13, 14

16 U.S.C. § 1538 ...................................................................... 6, 7, 12, 15

16 U.S.C. § 1540 ............................................................................. 12, 26

OR. REV. STAT. §§ 527.260–527.992 ........................................................2

**Rules**

Fed. R. App. P. 29 ................................................................................1

**Regulations**

50 C.F.R. § 17.3 (2022) ............................................................. 6, 10, 11

50 C.F.R. § 402.14 (2022) ......................................................................14

Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat

for the Marbled Murrelet,

81 Fed. Reg. 51348 (Aug. 4, 2016)......................................................13

Endangered and Threatened Wildlife and Plants; Final Designation of Critical

Habitat for the Marbled Murrelet,

61 Fed. Reg. 26256 (May 24, 1996) ........................................... 13, 14

**Other Authorities**

Anna Johnson, *Oregon's Forest Sector Employment Totals 62,000 in 2021*, STATE

OF OREGON EMPLOYMENT DEPARTMENT'S WORKFORCE AND ECONOMIC

RESEARCH DIVISION (Nov. 28, 2022).................................................2

Oregon Forest Resources Institute, *Oregon Forest Facts*, 3 (2021-22 Ed.)..............3

# I.     IDENTITY AND INTERESTS OF *AMICUS CURIAE* AND SOURCE OF AUTHORITY

The Oregon Forest Industries Council ("OFIC") is a nonprofit trade association representing over fifty Oregon forestland owners and forest products manufacturers.[1] OFIC's members combine sustainable forest management practices with the latest science and technology to continuously improve the environmental, social, and economic value of healthy working forests. To this end, OFIC advocates on behalf of its members before governmental agencies, legislatures, the public, and the courts.

The forest sector is the economic foundation for much of Oregon. Many thousands of Oregonians take pride in working in the woods as professional foresters, loggers, road engineers, truck drivers, and tree planters. Many others work in the numerous manufacturing facilities that produce lumber, cardboard, toilet paper, furnishings, printer paper, and other essentials. In large geographic swaths of Oregon, the forest sector is the largest and most reliable source of

---

[1] This brief's source of authority is by leave of court pursuant to Fed. R. App. P. 29(a)(2). A motion seeking leave to file accompanies this brief. *See* Fed. R. App. P. 29(a)(3). No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing this brief; however, Roseburg Forest Products Co. is a member of OFIC. No person—other than OFIC, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

family-wage employment. In 2021, Oregon's Employment Department estimated that approximately 62,000 Oregonians worked in the forest sector, which was equivalent to three percent of all jobs in the state.[2] Despite these jobs primarily being in rural areas, forest sector wages are estimated to be seven percent higher than the state's average wages.[3]

Oregon's forest sector takes pride in its land stewardship ethic and its sustainable practices. In 1971, at the behest of the sector, Oregon became the first state to pass a comprehensive Forest Practices Act, which sets standards for all commercial activities involving the establishment, management, or harvesting of trees on forestlands. *See* OR. REV. STAT. §§ 527.260–527.992. The Forest Practices Act has continuously evolved for over fifty years to ensure that forestry operations are conducted to the highest environmental standards that apply anywhere in the world. Today, approximately three tree seedlings are planted for every one tree harvested, which ensures that the sector is sustainable and that

---

[2] Anna Johnson, *Oregon's Forest Sector Employment Totals 62,000 in 2021*, STATE OF OREGON EMPLOYMENT DEPARTMENT'S WORKFORCE AND ECONOMIC RESEARCH DIVISION (Nov. 28, 2022), https://www.qualityinfo.org/-/oregon-s-forest-sector-employment-totals-62-000-in-2021-2?redirect=%2F#:~:text=Forest%20sector%2Drelated%20employment%20in,for%203%25%20of%20Oregon's%20workforce.

[3] *Id.*

crops of trees will be available to benefit future generations. Additionally, large numbers of merchantable trees are required to be left standing on the landscape after harvests occur to provide wildlife habitat and to protect sensitive resource sites such as stream corridors and wetlands.

By properly managing working forests, the sector provides numerous important public benefits at no cost. These include sequestering atmospheric carbon, delivering clean drinking water, reducing wildfire risk, providing outdoor recreation, and protecting wildlife habitats from suburban sprawl. The sector does all of this while also maintaining the critical flow of raw materials to mills. The overarching goal of the sector is to be sustainable in every aspect— environmentally, socially, and economically.

OFIC members manage over three million acres of private forestland in Oregon, and they manage many millions of additional acres throughout the United States. In Oregon, private lands are the source of approximately seventy-six percent of the raw timber that is harvested.[4] Historically, much higher volumes of timber came from publicly owned lands, such as national forests, but over the past forty years, concerns related to endangered species have severely

---

[4] Oregon Forest Resources Institute, *Oregon Forest Facts*, 3 (2021-22 Ed.), https://oregonforests.org/sites/default/files/2021-01/OFRI_2021ForestFacts_WEB3.pdf.

restricted the harvesting of timber on both federal and state lands. This loss of publicly sourced timber caused a significant contraction in the sector and resulted in the closure of many forest products manufacturing facilities. Today, log markets remain tight and decreases in harvested timber volume remain a constant threat. Given the diminished availability of publicly sourced timber, the lands managed by OFIC's members are more critical than ever to safeguarding the health and vitality of the entire sector.

Based on its significant and ongoing interest in ensuring that timber can be harvested from private lands, OFIC urges this Court to reverse the district court's decision to permanently enjoin the Benson Snake logging operation (the "Project"). Reversal is required because the district court misapplied the standard for finding a future take of an endangered species due to habitat modification under Section 9 of the Endangered Species Act ("ESA").[5]

The appropriate standard requires a showing that a proposed habitat modification is reasonably certain to imminently and actually kill or injure an individual member of a species. The district court's opinion failed to make this

_____

[5] Both the text of the ESA and Supreme Court precedent imply that enjoining future take is never appropriate. However, based on this Court's precedent, OFIC makes no arguments on this point before this Court and defers to Defendants on this issue. OFIC reserves its right to make such arguments if additional appeals follow and in other litigation.

finding, and instead found that because habitat within the Project area had been visited by marbled murrelets in the past, the modification of that habitat would cause actual injury to the species in the future. Such a holding dangerously expands the scope of Section 9 to protect suitable habitat in instances where there is no demonstration that modifying that habitat will imminently or actually harm an individual species. Section 7 of the ESA is the tool that protects habitat for endangered species—not Section 9. Allowing plaintiffs to enjoin logging operations under Section 9 because previously used habitat will be modified is a major change in the law that puts Oregon's forest sector at significant risk.

This risk is magnified given that many OFIC members own large tracks of timberlands that provide habitat to numerous endangered species. From coho salmon to northern spotted owls, habitat for endangered species is ubiquitous in working forests, as well as on agricultural lands, rangelands, and in suburban communities around the country. Given the ubiquity of endangered species inhabiting the landscape, forest managers spend significant resources to ensure compliance with the ESA. If, however, Section 9 of the ESA can be triggered to require protection of *habitat* whenever an area has the possibility of future use by a species, landowners will become much more constrained in their abilities to work around these species. The balance between protecting habitat and protecting individual species was struck by Congress in its careful crafting of the

differences between Sections 7 and 9 of the ESA, and the district court's opinion dangerously disrupts that balance.

Additionally, as it pertains to the required citizen suit notice, this Court should reject Plaintiffs' tactic of issuing anticipatory notices far in advance of unplanned projects. Plaintiffs utilize such notices to dissuade any development of large areas of habitat and, because of their premature nature, simply cannot be tailored to the evidentiary requirements of Section 9. Indeed, endorsing such notices undermines the policy rationale behind the notice requirement—which is to give parties a meaningful opportunity to abate *specific alleged violations* without judicial intervention. In other words, the tactic of using broad anticipatory notices eliminates the ability of landowners to voluntarily take affirmative steps to address specific concerns, and instead sends cases straight into litigation. Plaintiffs should not be permitted to short-circuit the ESA's notice requirements so easily to the detriment of landowners.

## II.        SUMMARY OF ARGUMENT

Section 9 of the ESA prohibits the "take" of endangered fish and wildlife. 16 U.S.C. § 1538(a)(1)(B). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). In upholding the United States Fish and

Wildlife Service's ("USFWS")[6] definition of "harm," codified at 50 C.F.R.

§ 17.3 (2022), the Supreme Court held that a take could only be found to have

occurred through habitat modification if a species had "actually been killed or

injured." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,

515 U.S. 687, 703 (1995) (hereinafter "*Sweet Home*").

In requiring that habitat modification actually kill or injure a species to

constitute a take, the Supreme Court recognized a critical distinction between

Sections 7 and 9 of the ESA by holding that "Section 7 imposes a broad,

affirmative duty to avoid adverse habitat modifications that [Section] 9 does not

replicate." *Id*. Section 7 is the legal tool through which Congress ensures that

endangered species, on a population level, have adequate suitable habitat. *Id.*; 16

U.S.C. § 1536. In turn, Section 9 protects individual species from direct death or

injury—it is not a habitat protection tool. 16 U.S.C. § 1538.

There are, of course, situations where habitat modification will actually

kill an animal that is relying upon a particular parcel of habitat. In such

circumstances, when seeking to enjoin a future take based on habitat

---

[6] Two federal agencies implement the ESA. The USFWS, within the Department of the Interior, has jurisdiction over terrestrial species. NOAA Fisheries, within the Department of Commerce, has jurisdiction over marine and anadromous species. Because the marbled murrelet falls within the jurisdiction of the USFWS, this brief refers to the USFWS as the regulating agency.

modification under Section 9, this Court requires plaintiffs to make a showing that there is a "reasonably certain threat of imminent harm to a protected species." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996), *as amended on denial of reh'g*, (June 26, 1996) (citing *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 786 (9th Cir. 1995)); *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511-12 (9th Cir. 1994); *see also American Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir. 1993). This standard navigates the line between what *Sweet Home* requires—actual death or injury of a species—and the commonsense notion that if an identifiable endangered species is in real and imminent peril, then there should be some injunctive remedy to protect that specific animal.

The district court's decision strays too far, and improperly converts Section 9 into a tool requiring much broader levels of habitat preservation. Specifically, the district court erred by enjoining the Project without finding that it was reasonably certain that a specific marbled murrelet would actually and imminently be killed or injured. Instead, the district court's findings rely heavily on a classification of the habitat as "occupied" under the Pacific Seabird Group's surveying protocol, but the court failed to acknowledge that this classification did not mean that murrelets were using the area—it simply meant that a single murrelet had demonstrated breeding behavior in the Project footprint in 2014,

and also that birds had subsequently shown similar behaviors in nearby locations. 1-ER-52–53. While the court did find that murrelets could return to the Project area at some undetermined time in the future, there was no finding that there was a "reasonably certain threat of imminent harm" to any specific murrelet from the Project. 1-ER-55–57.

When properly distilled, the district court only found that (1) the area contained habitat which could be utilized by a murrelet for breeding purposes; (2) there was evidence of historical murrelet use; (3) if the Project was allowed to move forward, the habitat would no longer be suitable; and (4) that any murrelets that might visit the area in the future would not be able to use the area for breeding purposes. These broad-stroke findings are insufficient to enjoin a project for future take under Section 9 because they fail to identify any imminent harm that will befall any specific murrelet. If such habitat-centric findings were sufficient under Section 9, then plaintiffs could enjoin property owners from modifying suitable habitat based upon the mere assertion that loss of habitat automatically harms the species. This is the dangerous misapplication of Section 9 that the majority, Justice O'Connor's concurrence, and the dissent all acknowledged was improper in *Sweet Home*. *See, e.g.*, 515 U.S. at 703-06 (majority opinion); *id.* at 708-709 (O'Connor, J., concurring); *id.* at 715-16 (Scalia, J., dissenting).

In an effort to address *Sweet Home's* requirement that a take only occurs when the modification of habitat "actually kills or injures wildlife," the district court held that any impairment of breeding is categorically "actual injury" as a matter of law. 1-ER-55. But, a court cannot simply find that a variety of alleged future harm is categorically an "actual injury" in place of finding that a specific injury will actually and imminently occur with reasonable certainty on a case-by-case basis. The district court fundamentally misunderstood what *Sweet Home* requires in terms of showing that an injury will actually occur. 515 U.S. at 703; 50 C.F.R. § 17.3. The actually injured standard is a question that must be satisfied on the record of each case, not categorically resolved through legal interpretation.

Under the district court's approach of defining what is "actual injury," the planned harvesting of any suitable murrelet habitat could be subject to an injunction under Section 9. Applying the district court's approach destroys the Supreme Court's *Sweet Home* decision, ignores this Court's precedents, and gives suitable habitat a level of protection that is above and beyond that ensured by Section 7. The district court's opinion is a dangerous expansion of Section 9 of the ESA that will have major negative implications for the forest sector and on other property owners across large swaths of the United States.

### III.    ARGUMENT

The district court erred in finding that the Project will "harm" and "harass" murrelets as to constitute take under Section 9 of the ESA. Despite finding harassment, the opinion lacked any specific findings or discussion regarding harassment.[7] Instead, the sole focus of the opinion is on the concept of harm. The USFWS has defined "harm" to mean:

> *Harm* in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3.

The district court's opinion is foundationally flawed because it fails to appropriately apply the harm standard in the context of habitat modification, and because it loosens the evidentiary requirements that constrain Section 9 from becoming a habitat preservation tool that swallows Section 7 of the ESA.

---

[7] The USFWS has also provided a definition for "harass" in its implementing regulations. *See* 50 C.F.R. § 17.3. While the definition of harm includes a provision related to habitat modification, the definition of harass makes no reference to habitat modification. Instead, it focuses on whether actions "annoy" a species. To "annoy" the marbled murrelet, the bird would need to be present in the forest at the time of the Project. However, the Project is slated to occur outside of the murrelet nesting season, during the time of year that the birds live on the ocean. *See* 2-ER-255, 275.

**A.  A Holistic View of the ESA Is Required to Understand How Habitat and Individual Members of a Species Are Addressed Differently.**

The ESA is a multi-pronged tool designed to conserve threatened and endangered species. This case is a citizen suit brought to enjoin a logging operation for alleged future take under Section 9. 16 U.S.C. §§ 1538, 1540(g). In the ESA framework, Section 9 is the tool that prohibits the direct killing and injuring of individual endangered species. The ESA also contains Section 7, which is the tool that ensures endangered species will have sufficient habitat at a population level. 16 U.S.C. § 1536. While this case does not involve Section 7, its resolution requires an understanding of how Sections 7 and 9 work together to conserve species.

Understanding this important interplay first requires a review of Section 4, which requires that, at the time a species is listed under the ESA, the USFWS must "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). This designation must be based on the "best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

In 1996, the USFWS designated 1,515,300 acres of land in Oregon as critical habitat for the marbled murrelet, and a total of 3,887,800 acres in California, Oregon, and Washington. *See* Endangered and Threatened Wildlife

and Plants; Final Designation of Critical Habitat for the Marbled Murrelet, 61 Fed. Reg. 26256, 26269 (May 24, 1996). After further evaluation, in 2011 the USFWS reduced the designation to 3,698,100 acres, a decision that was then reaffirmed in 2016 after further study. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Marbled Murrelet, 81 Fed. Reg. 51348 (Aug. 4, 2016). None of the land in this case has ever been designated as critical habitat for the marbled murrelet.

A designation of critical habitat under Section 4 does not, on its own, do anything to help species in need. Instead, Section 7 operationalizes Section 4 designations by requiring all federal agencies to consult with the USFWS to "[e]nsure that any action authorized, funded, or carried out by such agency" is not likely to adversely affect critical habitat of a listed species. 16 U.S.C. § 1536(a)(2). Thus, "[a] critical-habitat designation does not directly limit the rights of private landowners. It instead places conditions on the Federal Government's authority to effect any physical changes to the designated area, whether through activities of its own or by facilitating private development." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 365-66 (2018).

Collectively, Sections 4 and 7 identify a reserve of critical habitat and protect that habitat by requiring consultation for all actions with a federal nexus

that might modify the habitat.[8] This federal consultation process requires the creation of a biological assessment and/or a biological opinion, which necessitates the consulting agency to investigate whether modifying the habitat will jeopardize the species. *See* 50 C.F.R. § 402.14 (2022) (USFWS regulations governing consultation). If proposed actions would adversely modify critical habitat, then the USFWS can require an applicant to take "reasonable and prudent alternatives" to avoid adverse modification. 16 U.S.C. § 1536(b)(3)(A), (4)(A); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007); *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 53 (9th Cir. 2022). As voluminous litigation has proven, Section 7 routinely stops (or mitigates) the modification of critical habitat, and it has repeatedly worked to ensure that species do not lose habitat to a point that recovery becomes impossible. *See, e.g.*, *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012); *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Bureau of Reclamation*, 426 F.3d 1082 (9th Cir. 2005).

---

[8] 1,338,200 acres of the critical habitat designated in Oregon in 1996 is federal land, meaning that Section 7 applies to any modification that could potentially occur. *See* Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Marbled Murrelet, 61 Fed. Reg. at 26269.

Having established Section 7 to ensure that endangered species will have adequate habitat (both in terms of quantity and quality) into the future, Congress enacted Section 9 to achieve a different end. Specifically, Section 9 prevents the direct "take" of endangered species, in addition to prohibiting various commercial activities related to endangered species. 16 U.S.C. § 1538(a)(1)(B). Thus, under Section 9, the focus is on ensuring that individual members of a species are not killed, injured, or commercially exploited. Section 9 is disconnected from the question of whether a species has enough quality habitat to persist or recover. As noted in *Sweet Home*, "Section 7 imposes a broad, affirmative duty to avoid adverse habitat modifications that [Section] 9 does not replicate." 515 U.S. at 703. In cases such as this, that do not involve any critical habitat, the question is not whether the Project will modify habitat that a species might utilize in the future. Instead, the question is whether the Project will actually and immediately kill or injure a specific murrelet. *Id.* This requires a record-based inquiry into whether a species is actually going to be killed or injured—it is not an analysis that can be done simply by identifying habitat and speculating about what may occur in the future.

A crucial flaw in the district court's opinion is that it extends absolute and indefinite protections to suitable habitat because that habitat may be used by marbled murrelets at some point in the future. But, in a Section 9 case, the

question is not whether habitat modification today may have some potential impact on some member of the species in the future. Instead, what the court must address is the *immediate question* of whether a specific bird faces an imminent threat of actually being killed or injured. As discussed below, the district court's approach expands the scope of Section 9's take prohibition into a habitat protection tool that is inconsistent with the statutory framework of the ESA.

**B.     The Standard for Proving Harm from Habitat Modification.**

The district court articulated the standard for demonstrating harm to a species as needing to show: "(1) actual death or injury, (2) to identifiable members of a listed species, [and] (3) which must be proximately caused by the challenged activity and be foreseeable." 1-ER-55. This standard was not directly cited from a case, but instead cobbled together from three footnotes in *Sweet Home* and Justice O'Connor's widely cited concurrence in that case. *Id.* What the district court missed were the additional requirements that apply when a plaintiff is seeking to enjoin a *future take*, which are (1) reasonable certainty that the future take will actually occur, and that (2) the harm is imminent. *Marbled Murrelet*, 83 F.3d at 1066; *Rosboro Lumber Co.*, 50 F.3d at 786-87; *Coal. for a Sustainable Delta v. John McCamman*, 725 F. Supp. 2d 1162, 1170 n. 9 (E.D. Cal. 2010) (applying the burden of reasonable certainty of imminent harm from *Marbled Murrelet*).

Because *Sweet Home* arose from a facial challenge to the USFWS's regulatory definition of harm, it did not address the question of whether it was appropriate to enjoin habitat-modifying activities to prevent alleged future take under Section 9. While not directly addressing the issue of future take, the *Sweet Home* majority noted that "the Government cannot enforce the [Section] 9 prohibition until an animal has actually been killed or injured." 515 U.S. at 703. Shortly after *Sweet Home* was decided, this Court had occasion to evaluate whether its precedents related to enjoining future take had been displaced by the above quotation from *Sweet Home*. *Marbled Murrelet*, 83 F.3d at 1064. This Court found that *Sweet Home* had not displaced its precedent that an injunction could be issued under Section 9 upon a showing that an action posed a "reasonably certain threat of imminent harm to a protected species." *Id.* at 1066. Thus, this Court found that to enjoin future take, harm must be (1) shown under the *Sweet Home* standard, and also (2) be reasonably certain and imminent.

In permanently enjoining the Project, the district court erred by failing to evaluate the additional factors that this Court applies in the context of future take. If these two critical factors are not adequately considered (in addition to the other *Sweet Home* factors), then plaintiffs are able to enjoin activities based on speculative assertions that habitat modifications will harm some species at some unspecified time in the future. This is the type of unbridled take allegation that

*Sweet Home* guards against and which the district court improperly allowed to support the injunction in this case. *See* 515 U.S. at 700 n.13 (rejecting the dissent's concerns and stating that the regulatory "definition of 'harm' is subservient to the phrase 'an act which actually kills or injures wildlife'"); *id.* at 709 (O'Connor, J., concurring) (stating that the regulatory definition of harm "is limited by its terms to actions that actually kill or injure individual species").

Turning back to the three harm factors that the district court identified from *Sweet Home*, it is clear that they too were misapplied or not applied at all. *See* 1-ER-55–57. As to the "actual death or injury" prong, the district court simply held that:

> The Ninth Circuit has held that, under the regulatory definition of "harm" upheld by the Supreme Court in *Sweet Home*, impaired breeding is considered actual injury and, thus, harm to an animal. *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996); Plaintiffs are, therefore, not required to show that Defendants' proposed implementation of timber harvest will cause some additional "actual injury" beyond significant impairment of essential behavioral patterns of marbled murrelets in the Benson Ridge Parcel, despite Defendants' arguments to the contrary.

1-ER-115. The district court's error here may seem subtle at first glance, but it is incredibly impactful. The court analyzed only whether a classification of injury (impaired breeding) is categorically an "actual injury" that in turn constitutes harm under Section 9. The law is clear that impaired breeding can result in injury, but the question is not whether the alleged injury can be classified as an

"actual injury," but instead whether the action "actually kills or injures wildlife." Actual injury must be proven on the record of a case; it is not a mere classification question that can be resolved by looking at legal precedence. Thus, the court needed to meaningfully evaluate whether the alleged conduct would actually result in injury and death to a marbled murrelet, not just anchor its holding on a general definition of actual injury. The district court failed to finish the analysis that it laid out for itself, and instead simply overrode the process after making a categorical "actual injury" determination.

The district court identified two other factors as being required by *Sweet Home*—that the injury must be "(2) to identifiable members of a listed species[] [and] (3) which must be proximately caused by the challenged activity and be foreseeable." 1-ER-55. While it correctly identified these factors as applicable, the court then simply ignored them in the analysis. Thus, it made no finding that an identifiable member of the species would be harmed or that such harm would be proximately caused by the Project. That a plaintiff must affirmatively prove that death or injury will actually befall an identifiable member of a species is a critical requirement of the harm definition, and its importance was highlighted in Justice O'Connor's *Sweet Home* concurrence, where she wrote in part:

> My agreement with the Court is founded on two understandings. First, the challenged regulation is limited to significant habitat modification that causes actual, as opposed to hypothetical or speculative, death or injury to <u>identifiable protected animals</u>. Second, even setting aside

difficult questions of scienter, the regulation's application is limited by ordinary principles of proximate causation, which introduce notions of foreseeability.

515 U.S. at 708–09 (O'Connor, J., concurring) (emphasis added).

Consistent with *Sweet Home* and this Court's own precedents, this Court should, at a minimum, require a showing of: (1) actual physical death or injury, (2) to identifiable members of a listed species, (3) which must be proximately caused by the challenged activity and be foreseeable, (4) which is reasonably likely to occur, and (5) which is imminent.

Such a standard properly observes the distinct and unique statutory roles of Sections 7 and 9 of the ESA and allows private landowners to understand and maneuver within the regulatory framework. Specifically, a landowner who owns critical habitat knows that in order to modify that habitat, assuming a federal nexus, the project must go through the Section 7 process, likely requiring consultation and the obtaining of an incidental take statement. A landowner who owns non-critical suitable habitat knows that they must not kill or injure endangered species that have been identified on their property, but they also have assurances that their property rights will not be constrained by the ESA simply because they have habitat elements on their land. Absent a showing that a proposed habitat modification is reasonably certain to imminently and actually

kill or injure an individual member of a species, Section 9 of the ESA does not

tie the hands of a property owner.

**C.     Critical Flaws in the District Court's Approach and Findings.**

As noted above, the district court did not direct its findings to the three

factors that it articulated from *Sweet Home*, nor did it identify or address the

additional future take factors that have been laid out by this Court. The upshot is

that the district court's findings are scattershot and require some threading

together to understand in the context of the appropriate standard.

The factual finding upon which the district court appears to put the most

weight is its finding that the Project area is "occupied" habitat under the Pacific

Seabird Group's Protocol (the "Protocol"). *See generally* 8-ER-1683–762. It is

critical to understand that "occupied" is a *habitat classification* used in the

Protocol, and it does not mean that there are actually birds utilizing any specific

segment of habitat at any given time.[9] A stand of trees is classified as occupied

based on the suitability of the area for murrelets (i.e., forest characteristics) and

past detections of birds in the area which suggests they were using trees in the

general vicinity at the time of detection. *See* 8-ER-1709. Thus, categorizing a

---

[9] Marbled murrelets only use forested environments from approximately April 1 to September 15 in Oregon, and solely for breeding purposes. 2-ER-257. Thus, for approximately half the year there is no possibility of a murrelet being in an "occupied" stand.

stand of trees as "occupied" means that the area has suitable habitat that was once associated with murrelet breeding behaviors. The Protocol notes that "[t]he extent of use, re-use, or abandonment of nest areas, or establishment of new areas, is unknown." 8-ER-1710. Thus, the Protocol authors wrote, "[w]e have no data from which we can recommend how long after surveys are completed that the results of those surveys remain valid." *Id.* Because the Protocol was designed to answer the question of identifying murrelet breeding habitat, and not to identify where individual murrelets were nesting at any one given moment in time, the authors went on to "recommend that occupied stands should be treated as occupied indefinitely." 8-ER-1711.

Despite the district court repeatedly relying on the Protocol's indefinite classification of occupied habitat, the authors acknowledge that once a stand of trees is classified as "occupied," that does not mean that birds are using it this year, next year, or any specific year. *See* 1-ER-38–39; 8-ER-1701. It simply means that the area was once equated with a visual observation that is correlated to breeding activities. 8-ER-1690. The Protocol does not strive to satisfy the heightened evidentiary requirements laid out in *Sweet Home*, which requires identifying the locations of individual marbled murrelets that are at risk of imminent harm. 515 U.S. at 703.

That the Protocol's occupancy classification does not satisfy the evidentiary requirements of *Sweet Home* is clear in the district court's findings. Notably, the court found that there were no detections of murrelets within the Project area that would suggest breeding behavior in either 2015 or 2016, despite diligent survey work being conducted each year by qualified biologists. 1-ER-51. Indeed, the single such detection in the Project's footprint occurred in 2014. 1-ER-52. The district court found that this single detection in 2014 was sufficient to categorize the habitat as "occupied" and to enjoin the Project permanently in 2022. This timeline is crucial. *Sweet Home* requires actual death or injury to constitute a take, and this Court will only enjoin a future take if it is imminent, yet the district court issued a permanent injunction approximately eight years after the only sighting of murrelet breeding behavior in the project area. *Sweet Home*, 515 U.S. at 703; *Marbled Murrelet*, 83 F.3d at 1066.

Seemingly aware of the very limited (and aging) evidence of murrelets utilizing the Project area, the district court also points to surrounding murrelet detections and argues that the Project will fragment areas of existing habitat and thus harm the population. Any injury from habitat fragmentation is entirely speculative and cannot be shown to be actual or imminent. There is no identified bird that will be harmed by fragmentation; it is simply an extension of the theory that more habitat is better. Unquestionably, the district court's real concern is the

protection of suitable habitat—to protect unidentified murrelets that may someday use that habitat. Specifically, the opinion holds that the Project "will result in harm by significant impairing, through the destruction and degradation of occupied murrelet habitat, their essential behavioral patterns—causing the murrelets' ability to nest and engage [in] essential breeding activities to cease there for 100 years or more." 1-ER-55–56. The court is using a habitat classification (i.e., occupied habitat) to protect an ecosystem function (murrelet nesting) permanently. This runs far afoul of *Sweet Home*.

The gravity of what the district court did cannot be downplayed. It issued a permanent and absolute injunction that created a habitat preserve for the marbled murrelet out of private property. In other words, the district court said that this land needs to be protected from development indefinitely to protect suitable habitat for the bird. Again, Section 7 is the ESA tool responsible for protecting critical habitat so that murrelets have places to nest and engage in essential breeding activities for the indefinite future. At most, Section 9 only applies to stopping the actual killing and injuring of specific murrelets in the immediate future. What the district court did in this case is extreme judicial overreach and poses a major threat to landowners across the country.

**D.    The Court Applied the Wrong Evidentiary Standard.**

Finally, the district court applied the wrong evidentiary standard in finding

that the Project would take marbled murrelets. Specifically, it held: "Plaintiffs

have established by a preponderance of the evidence, that the proposed logging

project will result in a 'take' of marbled murrelets under the ESA." 1-ER-56–57.

As noted above, this Court requires plaintiffs to meet the higher "reasonably

certain" burden of proof when seeking to enjoin a future take under the ESA.

*Marbled Murrelet*, 83 F.3d at 1066.

Applying this higher burden is critical to ensuring that Section 9 serves

only its limited role of protecting individual species and does not morph into a

broad-stroke habitat preservation tool. Additionally, placing this higher burden

on plaintiffs does not improperly reduce protections for species. Landowners

spend significant resources to avoid taking endangered species. Killing or

injuring an endangered species results in significant liability, both legally and in

the court of public opinion. The ability of landowners to effectively survey for

and protect endangered species is demonstrated by the very few instances in

which companies have ever been found to have actually killed endangered

species. The forest sector's survey and protect policies have been very effective

in implementing Section 9's requirements. As noted above, the sector's future

depends on it being sustainable at every level, and that includes adequately protecting endangered species.

Applying the lower "preponderance of the evidence" standard unnecessarily and improperly constrains the rights of property owners. As designed, the ESA ensures that habitat is protected under Section 7, and then only extends habitat protections onto non-critical habitat upon a heightened showing that an individual species is reasonably certain to be actually killed or injured.

## E.     The Court Must Not Endorse the Practice of Broad Anticipatory Citizen Suit Notices.

Under Section 11 of the ESA, a citizen suit can only commence if it "compl[ies] with a 60-day notice requirement." *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014) (citing 16 U.S.C. § 1540(g)(1)(A)). That notice "must at a minimum provide sufficient information so that the notified parties could identify and attempt to abate the violation." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015) (internal quotation marks, brackets, and ellipses omitted); *Friends of Animals v. Ashe*, 808 F.3d 900, 904 (D.C. Cir. 2015) (the ESA notice requirement "serves the important purpose" of providing the noticed party "an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit" (internal question marks omitted)).

Here, Plaintiffs purported to provide notice to Defendants in June 2014, one day prior to Defendants taking ownership of the parcel of land at issue and two years before a timber harvest plan was submitted to the Oregon Department of Forestry. 1-ER-29. Giving effect to such anticipatory notice under Section 11 of the ESA sets a precedent that undermines the purpose of the notice requirement.

Allowing anticipatory notices that predate a challenged action by many months, or longer, greatly undermines the utility of the notice requirement. Under the ESA, sixty-day notices are not just a procedural hurdle that plaintiffs must get over—they are intended to have the substantive effect of avoiding litigation and protecting species. A well-articulated sixty-day notice provides a substantive benefit to the recipient and allows them to work with the USFWS to avoid litigation. Landowners routinely self-regulate to ensure that their actions do not take endangered species, and a properly timed and factually correct notice will result in a landowner changing course. Anticipatory notices eliminate this benefit, creating grinding litigation where thoughtful work with the USFWS would be a better course of action.

Holding that Plaintiffs' notice was effective incentivizes parties to send blanket notices to landowners in a manner that undermines the very purpose of the notice requirement.

# IV.    CONCLUSION

At the heart of this case is the fundamental question of how Sections 7 and 9 of the ESA work together. Section 9 was never intended to provide the broad-brush habitat protections that the district court has interpreted it to require. Instead, the task of ensuring that species have adequate habitat is left to Section 7. By failing to observe the statutory construct of the ESA, the district court has made Section 9 into something that it was never intended to be.

Private landowners across the country own many millions of acres of suitable habitat for a long list of endangered species. If they can be enjoined from modifying that habitat based upon paper-thin allegations that endangered species may someday utilize those suitable habitats, the ESA will become an unbridled tool for plaintiffs to shut down projects of all varieties. Consistent with this Court's precedent and the Supreme Court's *Sweet Home* decision, OFIC respectfully asks this Court to respect the structure and intent of the ESA and reverse the district court's opinion.

RESPECTFULLY SUBMITTED this 10th day of April, 2023.

*s/ David O. Bechtold*
David O. Bechtold, OSB No. 133019
Northwest Resource Law PLLC
1500 S.W. First Avenue, Suite 985
Portland, OR 97201
503.664.3582
dbechtold@nwresourcelaw.com

Greg A. Hibbard, OSB No. 183602
Northwest Resource Law PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1568
ghibbard@nwresourcelaw.com

Attorneys for *Amicus Curiae* Oregon
Forest Industries Council

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate CM/ECF. I further certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated this 10th day of April, 2023.

*s/ David O. Bechtold*
David O. Bechtold, OSB No. 133019

Attorney for *Amicus Curiae* Oregon Forest Industries Council

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-35764

I am the attorney or self-represented party.

**This brief contains** | 6,499 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ David O. Bechtold | **Date** | 4/10/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*