**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CASCADIA WILDLANDS; CENTER FOR BIOLOGICAL DIVERSITY; AUDUBON SOCIETY OF PORTLAND, | No. 22-35764 |
| | D.C. No. 6:16-cv-01710-AA |
| *Plaintiffs-Appellees*, | |
| v. | |
| | OPINION |
| SCOTT TIMBER CO.; ROSEBURG RESOURCES CO.; RLC INDUSTRIES CO., | |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted February 8, 2024
Portland, Oregon

Filed June 26, 2024

Before: M. Margaret McKeown, Jay S. Bybee, and Daniel
A. Bress, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's judgment after a bench trial and entry of a permanent injunction against private timber companies that sought to harvest timber from private property in Oregon in a citizen suit brought by several environmental organizations under the Endangered Species Act.

The environmental organizations claimed that the logging project would cause a "take" of marbled murrelets by clearing acres of trees that these small seabirds used for breeding purposes. The district court agreed and entered a permanent injunction prohibiting the implementation of defendants' "Benson Snake" logging project.

The panel held that the court had jurisdiction even though the timber companies characterized plaintiffs' citizen-suit notice as an invalid "anticipatory" notice. The panel held that the Supreme Court had effectively overruled the Ninth Circuit's prior determination that the citizen-suit notice requirement of the Endangered Species Act is jurisdictional. Rather, the notice requirement is a claims-processing rule and therefore subject to waiver and forfeiture. Even though the timber companies possibly forfeited their challenge to the environmental organizations' notice letter, the panel exercised its discretion to reach the issue, and held that the notice was sufficient.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that to prove "harm," and thus a "take" under § 9 of the Endangered Species Act, a citizen-suit plaintiff must prove that the defendant is committing, or will commit, an act that actually kills or injures wildlife. This act may include significant habitat modification or degradation that significantly impairs essential behavioral patterns, including breeding, feeding, or sheltering. The district court applied the correct standard for "actual injury" when it concluded that impaired breeding is considered actual injury and, thus, harm to an animal. Additionally, the district court correctly applied this standard to the facts before it and, based on the record evidence, properly found that the timber companies' planned actions would "harm" marbled murrelets.

## COUNSEL

Daniel R. Kruse (argued), Kruse & Saint Marie LLC, Eugene, Oregon; Nicholas S. Cady, Cascadia Wildlands Project, Eugene, Oregon; Daniel C. Snyder, Public Justice, Washington, D.C.; Brian Segee, Center for Biological Diversity, Ojai, California; for Plaintiffs-Appellees.

Dominic M. Carollo (argued), Carollo Law Group, Roseburg, Oregon, for Defendants-Appellants.

David O. Bechtold, Northwest Resource Law PLLC, Portland, Oregon; Greg A. Hibbard, Northwest Resource Law, Seattle, Washington; for Amicus Curiae Oregon Forest Industries Council.

## OPINION

McKEOWN, Circuit Judge:

Marbled murrelets—a species of threatened birds that forage at sea and nest in forests—are no strangers to the federal courts, having been the subject of various lawsuits for more than twenty-five years. This appeal involves yet another Endangered Species Act ("ESA") challenge to a proposed logging project of property inhabited by marbled murrelets. Several environmental organizations (collectively "Cascadia Wildlands") brought a citizen suit against private timber companies (collectively "Scott Timber") that sought to harvest timber from private property in Oregon.[1] Cascadia Wildlands claimed that the logging project would cause a "take" in violation of the ESA by clearing acres of trees that marbled murrelets used for breeding purposes. *See* 16 U.S.C. § 1538(a)(1)(B). The district court agreed and entered a permanent injunction.

At the outset, we must determine whether we have jurisdiction because Scott Timber characterizes Cascadia Wildlands's citizen-suit notice as an invalid "anticipatory" notice. This issue is slightly tricky given our long-standing precedent that the ESA notice requirement is a jurisdictional rule. *See Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988). However, in recent years, the Supreme Court has clarified the distinction between jurisdictional rules and non-jurisdictional claims-processing requirements.

---

[1] The plaintiff-appellee environmental organizations are Cascadia Wildlands, the Center for Biological Diversity, and the Audubon Society of Portland. The defendant-appellant timber companies are Scott Timber Company, Roseburg Resources Company, and RLC Industries Company.

*See Wilkins v. United States*, 598 U.S. 152, 157 (2023) (emphasizing that claims-processing rules, which generally include "requirements that claimants must complete, or exhaust, before filing a lawsuit," are not jurisdictional in nature (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010))).  In view of recent intervening authority, we hold that the Supreme Court has effectively overruled our prior determination that the citizen-suit notice requirement of the ESA is jurisdictional.  Rather, this notice requirement is a claims-processing rule and therefore subject to waiver and forfeiture.  Here, even though Scott Timber may have forfeited its challenge to Cascadia Wildlands's notice letter, we exercise our discretion to reach the issue and hold that the notice was sufficient.  Additionally, the district court applied the correct legal standards for "take" under the ESA and properly based its factual findings that Scott Timber's planned actions would "harm" murrelets on the record evidence.  *See* 50 C.F.R. § 17.3.  We affirm.

## BACKGROUND

Marbled murrelets are small seabirds that spend most of their life feeding on fish in the ocean but fly inland to nest in the mature and old growth coniferous forests of the Pacific Northwest.  Murrelets do not build nests but lay a single egg on thick, flat tree branches with natural depressions and moss.  Usually, only very large trees within old growth forests contain suitable platforms for murrelet nesting. These secretive nesting habits in tall trees combined with camouflaged feather patterns and high velocity flight make murrelets notoriously difficult to detect.  In fact, the Pacific Seabird Group ("PSG")—"a society of scientists, seabird researchers, land managers and other seabird enthusiasts"— had to develop a Protocol to provide surveyors with

standardized techniques to detect marbled murrelets in forests.

Murrelets' reliance on old growth forests, however, has hindered the long-term survival of the species. Commercial logging has decimated the old-growth forests that once blanketed the Pacific Northwest and destroyed murrelet nesting sites. The loss of nesting habitat resulted in such a significant decline in the murrelet population that the U.S. Fish and Wildlife Service listed the marbled murrelet in California, Oregon, and Washington as a threatened species under the ESA in 1992.

The ensuing tension between timber harvesting and the protection of marbled murrelets has spawned numerous ESA suits against logging operations over the past three decades. *See, e.g.*, *Marbled Murrelet v. Babbitt* (*Marbled Murrelet I*), 83 F.3d 1060 (9th Cir. 1996). The history of the property at issue in this appeal, the Benson Ridge Tract ("Benson Tract"), exemplifies this ongoing saga. The Benson Tract is a 355-acre forested parcel that was once part of the Elliott State Forest, which is owned and managed by the State of Oregon. In 2012, Cascadia Wildlands sued the Oregon Governor and other officials to enjoin state-authorized logging activities and forestry management decisions on state-owned lands, including the Elliott State Forest, that allegedly caused the "take" of marbled murrelets in violation of the ESA. Several private timber companies, including Scott Timber, intervened as defendants. The federal district court in Oregon found that Cascadia Wildlands was likely to succeed on the merits of its ESA claim and issued a preliminary injunction prohibiting logging in any occupied murrelet habitat in the Elliott State Forest. *See Cascadia Wildlands v. Kitzhaber*, No. 3:12-cv-00961, 2012 WL 5914255, at *2 (D. Or. Nov. 19, 2012). After the preliminary

injunction was entered, the State canceled all its pending and proposed logging operations in occupied murrelet sites in the forests at issue and the parties settled. The State then announced a plan in January 2014 to auction off several parcels of state-owned land, including the Benson Tract. The State closed the auction in April 2014, and Scott Timber was the winning bidder for the Benson Tract.

But the sale of the Benson Tract did not end the dispute. As the State's appraisal letter had detailed, the Benson Tract had not been surveyed for murrelets but was likely occupied by them. In May 2014, surveyors with the Coastal Range Forest Watch recorded three detections of murrelets on the Benson Tract. In the wake of these detections, Cascadia Wildlands sent an ESA citizen-suit notice letter to Scott Timber on June 3, 2014. The letter stated that the Benson Tract was likely occupied murrelet habitat, that logging there would violate Section 9 of the ESA, and that the groups would pursue an injunction to prevent Scott Timber from logging the Tract.

A day later, Scott Timber acquired the deed to the Benson Tract. Following receipt of the notice letter, Scott Timber hired Western EcoSystems Technology, which surveyed the Benson Tract for marbled murrelets throughout 2015 and 2016. After conducting its surveys, Scott Timber proceeded with its "Benson Snake" logging project, a plan to clear-cut 49 acres of timber located in the middle of the Benson Tract. On August 13, 2016, Scott Timber notified the Oregon Department of Forestry of its planned Benson Snake project.

Just two weeks after Scott Timber's notice to the Department of Forestry, Cascadia Wildlands sued Scott Timber in federal court in Oregon. Cascadia Wildlands

asserted a single claim for violation of Section 9 of the ESA and moved for a preliminary injunction. The district court granted the preliminary injunction, but on appeal, we reversed. *See Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 624–25 (9th Cir. 2017). We held that the district court erred in its irreparable harm analysis because it did not specifically find that marbled murrelets likely inhabited the Benson Tract and would likely be harmed by the project. *Id.*

On remand, the parties agreed to forego further hearings on the preliminary injunction in favor of an expedited trial. After a five-day bench trial in May 2019, the district court held that the Benson Snake project would "harm" and "harass" marbled murrelets as defined in 50 C.F.R. § 17.3, thereby causing a "take" in violation of 16 U.S.C. § 1538(a)(1)(B). The court also entered a permanent injunction prohibiting the implementation of the Benson Snake project.

## ANALYSIS

## I. The ESA Notice Requirement

Before reaching the merits of the ESA claim, we first address whether Cascadia Wildlands complied with the ESA's notice requirement. To bring a citizen suit for a violation of the ESA, a private citizen must give "written notice of the alleged violation or violations upon which the suit is based at least sixty days before suit is filed." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 647 (9th Cir. 2015) (citing 16 U.S.C. § 1540(g)(2)(A)(i)). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation* (*Southwest Center*), 143 F.3d 515, 520 (9th Cir. 1998).

We have long held that the ESA notice requirement is jurisdictional. *See Save the Yaak*, 840 F.2d at 721. Scott Timber invokes this precedent to argue that we lack jurisdiction over this suit because Cascadia Wildlands's notice letter was an invalid "anticipatory" notice. In other words, the 2014 notice letter was insufficient because Cascadia Wildlands sent it two years before Scott Timber had begun implementing the Benson Snake project. In considering Scott Timber's jurisdictional challenge and in light of recent Supreme Court precedent on the jurisdictional versus claims-processing rule divide, we must revisit our prior jurisdictional holding. We review de novo both this jurisdictional challenge as well as the adequacy of the notice of intent to sue under the ESA. *See Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012); *Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014).

## A. Revisiting the Notice Requirement as a Jurisdictional Rule

The parties dispute whether we must adhere to our longstanding designation of the ESA notice requirement as jurisdictional. Over three decades ago, we held in *Save the Yaak Committee v. Block* that the ESA's 60-day notice requirement is jurisdictional, not procedural. 840 F.2d at 721. We later repeated this point without further comment in the half dozen cases in which we considered whether citizen plaintiffs fulfilled their notice obligations. *See, e.g.*, *Klamath-Siskiyou*, 797 F.3d at 647; *Southwest Center*, 143 F.3d at 520; *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072 (9th Cir. 1996).

But in recent years, the Supreme Court has tried "to 'bring some discipline' to the use of the term

'jurisdictional.'" *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). Recognizing that "[j]urisdiction . . . is a word of many, too many, meanings," the Court has sought to clarify the distinction between jurisdictional rules, which limit "the classes of cases a court may entertain (subject-matter jurisdiction) and nonjurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Wilkins*, 598 U.S. at 156–57 (cleaned up). "The latter category generally includes a range of 'threshold requirements that claimants must complete, or exhaust, before filing a lawsuit.'" *Id.* at 157 (quoting *Reed Elsevier*, 559 U.S. at 166).

The Court has reigned in its "less than meticulous use" of "jurisdictional" because the distinction between jurisdictional and claims-processing rules has significant consequences for litigants. *Gonzalez*, 565 U.S. at 141 (internal quotation marks and citation omitted). On the one hand, jurisdictional bars can be raised at any time, and "courts have a duty to consider them *sua sponte*." *Wilkins*, 598 U.S. at 157. Months or years of work may be wasted if "eleventh-hour jurisdictional objections prevail post-trial or on appeal." *Id.* at 157–58. Objections to claims-processing requirements, on the other hand, are subject to forfeiture, waiver, and estoppel, which "ensure efficiency and fairness by precluding parties from raising arguments they had previously disavowed." *Id.* at 158.

To determine whether a statutory condition has jurisdictional consequences, the Court developed a clear statement rule for us to follow: Congress must "clearly state[]" that a statutory requirement "shall count as jurisdictional." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515

(2006). However, "[t]his clear statement rule does not require that Congress incant magic words in order to speak clearly, and so the absence of the word 'jurisdiction' is not necessarily dispositive." *Organic Cannabis Found., LLC v. Comm'r of Internal Revenue*, 962 F.3d 1082, 1093 (9th Cir. 2020) (internal quotation marks and citation omitted). Rather, we must consider the "condition's text, context, and relevant historical treatment" to discern whether Congress imbued the provision with jurisdictional consequences. *Reed Elsevier*, 559 U.S. at 166 (citations omitted).

Applying the Court's test to the ESA notice requirement in Section 1540(g)(2)(A)(i), we conclude that our prior holding in *Save the Yaak* is "clearly irreconcilable" with the Court's recent case law addressing jurisdictional and claims-processing rules. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). As a three-judge panel, we are, of course, bound by circuit precedent. *See id.* at 899. However, we depart from this precedent when "our prior decision [has] been undercut by higher authority to such an extent that it has been effectively overruled." *Id.* If the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," we must abandon our prior holding and follow the dictates of the Court. *Id.* at 900.**[2]**

---

[2] We note that our court, at the three-judge panel stage, recently declined the opportunity to revisit a prior holding that the False Claims Act's first-to-file rule is jurisdictional. *See Stein v. Kaiser Found. Health Plan, Inc.*, No. 22-15862, 2024 WL 107099 at *1 (9th Cir. Jan. 10, 2024), *reh'g en banc granted, vacated*, 2024 WL 2042927 (May 8, 2024). But the posture of this case is a far cry from the situation at issue in *Stein*. The first-to-file rule at issue there was reaffirmed as jurisdictional by an en banc court during the Supreme Court's overhaul of its jurisdictional

Mindful of the Court's focus on the clear statement rule, we begin with the text of the ESA. Section 1540(g)(2)(A)(i) states, "No action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation . . . ." The provision does not reference "jurisdiction" in any manner. And even though the notice requirement "is cast in mandatory language," the Supreme Court has explicitly "rejected the notion that all mandatory prescriptions, however emphatic, are properly typed jurisdictional." *Henderson*, 562 U.S. at 439 (cleaned up). Thus, the language of Section 1540(g)(2)(A)(i) "provides no clear indication that Congress wanted that provision to be treated as having jurisdictional attributes." *Id.*

The remainder of Section 1540 bolsters a nonjurisdictional reading of the notice requirement. Although the term "jurisdiction" appears in two subsections of Section 1540—Sections 1540(c) and 1540(g)(1)—those subsections are not tied to the notice requirement in any way. Rather, Section 1540(c)—clearly captioned as "District Court Jurisdiction"—sets out the district courts' subject-matter jurisdiction over ESA suits: "The several district

---

precedents. *See U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1130 (9th Cir. 2015) (en banc). Thus, the panel in *Stein* concluded that *Hartpence* did not meet the "clearly irreconcilable" standard under *Miller*. 2024 WL 107099 at \*1. Notably, no en banc court has held that the ESA notice requirement is jurisdictional, and the last case of this court to truly consider the jurisdictional aspects of the notice issue was *Save the Yaak* in 1988, long before the Court's overhaul. 840 F.2d at 721. Given the decades that have passed since *Save the Yaak*—and the now well-established and clear guidance from the Supreme Court that has been formulated in the interim—we conclude that, as a three-judge panel, we may recognize the infirmity of the jurisdictional holding in *Save the Yaak*.

courts of the United States . . . shall have jurisdiction over any actions arising under this chapter." *See also* Endangered Species Act of 1973, Pub. L. No. 93-205, § 11(c), 87 Stat. 884, 898 (1973). The statute goes on, in Section 1540(g)(1), to address citizen suits, specifically providing that "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty . . . ." 16 U.S.C. § 1540(g)(1).

Notably, the notice requirement in Section 1540(g)(2)(A)(i) "appears in a separate provision" from the subsections that grant jurisdiction over ESA suits to the district courts, Sections 1540(c) and (g)(1). *Arbaugh*, 546 U.S. at 515. Congress clearly knows how to "delineat[e] the adjudicatory authority of courts," and it did so in Sections 1540(c) and 1540(g)(1). *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1851 (2019). "The contrast between the text of [Section 1540(g)(2)(A)(i)] and the unambiguous jurisdictional terms in related provisions shows that Congress would have spoken in clearer terms if it intended for [the notice provision] to have similar jurisdictional force." *Santos-Zacaria v. Garland*, 598 U.S. 411, 419 (2023) (cleaned up). Nothing in Section 1540 indicates that jurisdiction under the ESA is triggered only once the notice requirement is fulfilled. We must read Section 1540 as a whole and give credence to Congress's careful insertion of the term "jurisdiction" precisely where it meant for a provision to have jurisdictional effect, and not simply to provide notice of suit.

Finally, the historical treatment of the ESA notice requirement does not weigh in favor of interpreting the condition as jurisdictional. Although we have consistently

described the notice requirement as jurisdictional for over thirty years, our original holding in *Save the Yaak* rests on an extremely thin foundation. In *Save the Yaak*, we did not analyze the language of the ESA to conclude that the notice provision is jurisdictional. *See* 840 F.2d at 721. Rather, our holding rested entirely on our decision in *Hallstrom v. Tillamook County*, 831 F.2d 889 (9th Cir. 1987), *amended by* 844 F.2d 598, which had recently concluded that the similar citizen-suit notice requirement in the Resources Conservation and Recovery Act ("RCRA") was jurisdictional. *See Save the Yaak*, 840 F.2d at 721.

Not long after our decision in *Hallstrom*, the Supreme Court severely undercut this analysis. The Court refused to adopt our construction of the RCRA notice requirement as jurisdictional, instead holding that it was a "mandatory condition[] precedent to commencing suit . . . ." *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989). And the Court went on to explain that in light of its "literal interpretation of the statutory requirement," it "need not determine whether [the RCRA provision] is jurisdictional in the strict sense of the term." *Id.*

The Court's flagging of the jurisdiction question was a prescient warning when some years later it stated that courts should "curtail . . . drive-by jurisdictional rulings, which too easily can miss the critical differences between true jurisdictional conditions and nonjurisdictional limitations on causes of action." *Reed Elsevier*, 559 U.S. at 161 (cleaned up). In *Save the Yaak*, the court quickly disposed of the ESA claim without much analysis, focusing instead on alternative claims under the National Environmental Policy Act. 840 F.2d at 717–21. The "characterization [of the ESA notice requirement as jurisdictional] was not central to the case, and thus did not require close analysis." *Reed Elsevier*, 559 U.S.

at 161. The absence of any textual or contextual analysis
vis-a-vis the ESA bears out the description of the *Save the
Yaak* holding as a "drive-by jurisdictional ruling."

It bears noting that our sister circuits have not "uniformly
adopted a jurisdictional reading" of the ESA notice
provision. *Organic Cannabis*, 962 F.3d at 1095. Although
the Third Circuit has suggested that the provision is
jurisdictional, *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461,
471 (3rd Cir. 1997), the Fifth Circuit has held that it is a
mandatory procedural rule that can be waived, *Sierra Club
v. Yeutter*, 926 F.2d 429, 437 (5th Cir. 1991). No circuit has
addressed this question post-*Arbaugh*. Therefore, with no
"long line of Supreme Court decisions left undisturbed by
Congress [that] attached a jurisdictional label to the
prescription" nor Congress's confirmation or clear statement
of a jurisdictional understanding, nothing supports the view
that Congress intended for us to treat the ESA notice
requirement as jurisdictional. *Organic Cannabis*, 962 F.3d
at 1095 (quoting *Fort Bend County*, 139 S. Ct. at 1849).

Ultimately, Section 1540(g)(2)(A)(i) imposes a
precondition to filing an ESA citizen suit "that is not clearly
labeled jurisdictional, is not located in a jurisdiction-
granting provision," and has not been uniformly treated as
jurisdictional. *Reed Elsevier*, 559 U.S. at 166. Thus, the
Supreme Court's *Arbaugh* line of cases has "effectively
overruled" our conclusion in *Save the Yaak* that the ESA
notice requirement is jurisdictional. *Miller*, 335 F.3d at 899.
We therefore hold that the ESA notice requirement in
Section 1540(g)(2)(A)(i) is a mandatory claims-processing
rule, not a jurisdictional predicate. *See Hallstrom*, 493 U.S.
at 31 (holding that RCRA's analogous notice requirement
was a "mandatory condition[] precedent to commencing
suit").

## B. Forfeiture

Not so long ago, the Supreme Court instructed that mandatory claims-processing rules are "unalterable if properly raised by an opposing party." *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 714 (2019) (internal quotation marks and citation omitted). However, challenges to a party's adherence to these rules "can be waived or forfeited by an opposing party" if not raised at the proper time. *Id.* In general, we have held that an initial appeal is the proper time to raise an issue; otherwise, "[w]e need not and do not consider a new contention that could have been but was not raised on the prior appeal." *Munoz v. Imperial County*, 667 F.2d 811, 817 (9th Cir. 1982).

Here, Scott Timber failed to challenge the adequacy of the notice letter in its prior appeal in this court. When Cascadia Wildlands sought a preliminary injunction, Scott Timber opposed on the grounds that Cascadia Wildlands did not provide proper notice under the ESA. In the order granting the preliminary injunction, the district court explicitly considered and rejected Scott Timber's argument, teeing up the issue and making it ripe for review. But when Scott Timber pursued an interlocutory appeal of the preliminary injunction, it did not contest the district court's ruling on this issue, and we did not consider the sufficiency of the notice. *See Cascadia Wildlands*, 715 F. App'x at 623–25. Rather, Scott Timber chose to raise the adequacy of the notice again in the district court only after the interlocutory appeal. Having failed once again to prevail on the notice issue and the merits, Scott Timber now asks us to consider the notice issue anew.

Usually, the proper time to challenge the adequacy of the notice letter was on appeal of the order that first addressed

the sufficiency of the notice letter.  *See Jimenez v. Franklin*, 680 F.3d 1096, 1099–1100 (9th Cir. 2012).  Because Scott Timber did not do so when the issue was ripe—and potentially could have been dispositive to this case—it could be argued that Scott Timber forfeited its notice argument.

However, "we have discretion to reach an otherwise-forfeited issue in appropriate circumstances, especially when . . . the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Organic Cannabis*, 962 F.3d at 1092 n.6 (cleaned up).  The adequacy of a notice of intent to sue is a legal issue, and even though its resolution may rest on facts in the record, the record here is fully developed as a consequence of the trial and the district court addressed the adequacy of the notice on the merits. *See Klamath-Siskiyou*, 797 F.3d at 650–51.  We also recognize that Scott Timber may have proceeded with the understanding that it could raise its jurisdictional argument at any time under our prior precedent.  Given these circumstances, we will therefore exercise our discretion to consider whether Cascadia Wildlands's notice letter was adequate.

### C.  Adequacy of the Notice of Intent to Sue

We have previously stated that under the ESA, "[t]o provide proper notice of an alleged violation, a would-be plaintiff must 'at a minimum provide sufficient information so that the notified parties could identify and attempt to abate the violation.'" *Klamath-Siskiyou*, 797 F.3d at 651 (quoting *Southwest Center*, 143 F.3d at 522) (cleaned up).  To be sufficient, the notice does not have "to list every specific aspect or detail of every alleged violation." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d

943, 951 (9th Cir. 2002) (citation omitted). Rather, our analysis looks at the "overall sufficiency" of the notice by "examin[ing] both the notice itself and the behavior of its recipients to determine whether they understood or reasonably should have understood the alleged violations." *Klamath-Siskiyou*, 797 F.3d at 651 (citations omitted).

The unique circumstances of this case confirm that Cascadia Wildlands's June 2014 notice letter was sufficient for its suit against Scott Timber. The notice letter clearly "provide[d] sufficient information so that the notified parties could identify and attempt to abate" the prospective violation of Section 9 of the ESA. *Klamath-Siskiyou*, 797 F.3d at 651 (quoting *Southwest Center*, 143 F.3d at 522) (cleaned up).

As an initial matter, Scott Timber has long been involved in the litigation over timber harvesting in the Elliott State Forest. Before it received the notice letter and purchased the property, Scott Timber had intervened in Cascadia Wildlands's earlier suit against Oregon officials and was therefore aware of the Section 9 injunction that prohibited the State from logging in occupied marbled murrelet habitat in the Elliott State Forest, including the Benson Tract. *See Kitzhaber*, 2012 WL 5914255, at *2.

Cascadia Wildlands's 2014 notice letter reminded Scott Timber of this prior litigation, detailed the obligations of Section 9 and the impacts of logging on murrelets, and alleged that the Benson Tract was occupied marbled murrelet habitat in which logging would cause "take" of murrelets. Even though the Benson Snake project was not specifically mentioned in the letter, that project is within the Benson Tract, which the letter did discuss. And the allegations in the complaint that Cascadia Wildlands eventually filed mirrored those in the letter, reiterating that

logging in occupied marbled murrelet habitat in the Benson Tract would violate Section 9. *See Bosma Dairy*, 305 F.3d at 950–51 (stating that a notice is adequate so long as the claims in a citizen-suit's complaint are "of the same type" as the alleged violations detailed in the notice (internal quotation marks and citation omitted)). Thus, Scott Timber was on notice that any logging operation on the Benson Tract that was "reasonably likely to occur"—even if not specifically planned in 2014 when the notice was sent— would be alleged to be an ESA violation.

Additionally, a review of Scott Timber's behavior after it received the notice letter underscores that it "understood the alleged violations." *Klamath-Siskiyou*, 797 F.3d at 651 (citations omitted). While disclaiming any "concrete" or "imminent" plans to conduct a timber harvest, Scott Timber also admitted that it was interested in purchasing the Benson Tract for logging because of "the compatibility of Elliott State Forest timber with [Roseburg Forest Products's] high grade plywood manufacturing facilities." Further, Scott Timber responded to the notice by hiring marbled murrelet surveyors for the Benson Tract "to investigate [Cascadia Wildlands's] allegations and . . . to help inform . . . the company's strategy and preparation for anticipated litigation." Scott Timber's argument that the notice was "speculative and vague" is unfounded. Scott Timber purchased a specific parcel for timber and then took actions to determine whether the parcel was occupied by murrelets that would be harmed by planned logging operations,

following litigation—of which it was aware—involving this same issue.[3]

Given these circumstances, we conclude that the "anticipatory" aspect of Cascadia Wildlands's notice is of no import here. Neither our court nor any other circuit has directly addressed whether an anticipatory notice satisfies the ESA notice requirements under 16 U.S.C. § 1540(g)(2)(A). But our precedent clearly supports ESA citizen-suits for prospective violations, suggesting that anticipatory notices may be sufficient in specific situations. *See Marbled Murrelet I*, 83 F.3d at 1064 (holding that "an imminent threat of future harm is sufficient for the issuance of an injunction under the ESA"); *see also Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995) ("[T]he injunctive relief authorized by the citizen suit provision . . . is by its very nature directed at future actions."). Further, we—along with the First Circuit—have allowed for Clean Water Act and ESA citizen-suit notices that preceded violations so long as the notices were otherwise sufficient. *See Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000); *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001).

We purposely adopt no bright-line rule on anticipatory notices. However, the history of the Benson Tract, the alignment of the violations detailed in the notice letter and

---

[3] Scott Timber's attack on the notice based on the fact that it did not receive the deed for the Benson Tract until June 4, 2014, a day after it received the notice letter, unnecessarily elevates form over substance. Scott Timber already knew that it was the winning bidder and would take possession of the Tract when it received the notice on June 3, and Scott Timber's actions after receipt of the notice show that it took the allegations seriously as the new owner of the Tract.

the claims alleged in the complaint, and Scott Timber's response to the notice all confirm that the notice letter here was adequate. Thus, this citizen suit was properly commenced under 16 U.S.C. § 1540(g)(2)(A), and we proceed to the merits.

## II.  "Take" Under the ESA

Section 9 of the ESA makes it unlawful for anyone to "take" an endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). To prove "harm" under the ESA, citizen-suit plaintiffs must prove that the defendant is committing, or will commit, "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. This "act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* In other words, a citizen-suit plaintiff must prove that the injury to identifiable members of the protected species is of a type covered by the ESA and that the relationship between the challenged activity and the injury meet the standards of proximate causation. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 708–09, 712 (1995) (O'Connor, J., concurring). When analyzing a district court's "take" determination, we review the court's findings of fact for clear error and review de novo its conclusions of law. *See Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

### A.  Actual Injury

The Secretary of the Interior's "harm" regulation provides that a "significant habitat modification or

degradation" which "significantly impair[s] . . . breeding" qualifies as an act that "actually kills or injures wildlife." 50 C.F.R. § 17.3. Not only has the Supreme Court upheld this regulation, but we have also explicitly held that "a habitat modification which significantly impairs the breeding and sheltering of a protected species amounts to 'harm' under the ESA." *Marbled Murrelet*, 83 F.3d at 1067 (referring to *Sweet Home*, 515 U.S. 687).

The district court explicitly applied this standard for "actual injury." The court's articulation of the standard—that "impaired breeding is considered actual injury and, thus, harm to an animal"—aligns with our holding in *Marbled Murrelet*. 83 F.3d at 1067. Additionally, the district court correctly applied this standard to the facts before it, finding that the proposed logging project would eliminate 49 acres of old-growth forest occupied by marbled murrelets, thereby qualifying as a "significant habitat modification or degradation." 50 C.F.R. § 17.3. The court went on to find that Scott Timber's proposed clearcut would "significantly impair[]" the breeding of murrelets by preventing them from returning to that portion of the Benson Tract to nest and engage in other breeding activities for the next century. *Id.* These findings lead to the conclusion that Scott Timber's "habitat modification would actually injure [murrelets] by significantly impairing their essential behavioral patterns, including breeding . . . ." *Rosboro Lumber*, 50 F.3d at 788.

Nothing required the district court to determine, in evaluating actual injury, that the Benson Snake area was "essential" for the murrelets' survival. We have never imposed a heightened "essential" requirement for actual injury under the ESA, and Scott Timber does not persuade us why we should switch course now. Although Scott Timber seeks to insert this descriptor in order to tip the scales

in its favor, an "essential" habitat requirement would upend our long-held approach. It would rewrite the ESA and its regulations that already require that a habitat be *used* by members of a protected species, that the habitat be *significantly* modified or degraded, and that the modification or degradation *significantly* impair the species' *essential* behavioral patterns. *See* 50 C.F.R. § 17.3. We decline to rewrite the statute to narrow this already circumscribed approach.

The record amply supports the district court's factual findings underlying its actual injury determination. The district court's reliance on the PSG Protocol to find that the Benson Tract was occupied by murrelets—and should be considered occupied indefinitely—was not clearly erroneous. The court devoted several pages of its opinion to explaining why it found the PSG Protocol to be an "effective, appropriate, and reliable method" for surveying marbled murrelets. It pointed to the extensive use and acceptance of the Protocol by scientists, private industry, and governmental entities, relied on the testimony of witnesses and experts during the trial, and noted our prior approval of federal agencies' reliance on the Protocol. *See, e.g.*, *Nw. Forest Res. Council v. Pilchuck Audubon Soc'y*, 97 F.3d 1161, 1167–70 (9th Cir. 1996). Also, instead of sweeping aside Scott Timber's critiques of the Protocol, the district court carefully considered its arguments, including the testimony of its expert, Dr. Strickland, but rejected them given the robust scientific and legal basis for the Protocol's methodology.

As for the district court's finding that removing 49 acres of habitat would imminently injure murrelets, the record incorporates numerous pieces of evidence from which the court could infer that murrelets would return to the Benson

Tract to nest and go nowhere else. Apart from the Protocol's dictate that the Benson Tract should be treated as occupied indefinitely, Cascadia Wildlands's expert, Dr. Golightly, testified that murrelets have high nest-site fidelity, even to the scale of the nest tree, indicating that murrelets that nested in the Benson Tract would return. Dr. Golightly and Cascadia Wildlands's other expert, Dr. Falxa, buttressed the conclusion that murrelets were "not just going to go somewhere else" if their nesting habitat was removed.

These findings demonstrate that the chain of events that would result in injury to the murrelets is direct, not attenuated. In contrast, in *American Bald Eagle v. Bhatti*, the First Circuit held that the plaintiffs failed to prove actual injury to bald eagles because they did not provide evidence that eagles had actually ingested lead slugs left in deer carrion after a deer hunt. 9 F.3d 163, 166 (1st Cir. 1993). But there is no such supposition or attenuation here. The district court found that Scott Timber's timber harvest would directly remove and fragment occupied murrelet habitat used for breeding. The district court thus applied the correct injury standard and committed no factual error in holding that the timber harvest would cause actual injury and therefore "harm" under the ESA.

### B. Proximate Causation

The question remains whether Cascadia Wildlands, in endeavoring to prove "harm" under the ESA, has provided sufficient evidence that the challenged activity would "proximately," and foreseeably, cause "actual, as opposed to hypothetical or speculative, death or injury to identifiable protected animals." *Sweet Home*, 515 U.S. at 708–09, 712 (O'Connor, J., concurring); *see also id.* at 691 n.2, 700 n.13 (majority opinion).

The evidence more than supports the district court's conclusion that Cascadia Wildlands had met its burden in demonstrating that proposed timber harvest would specifically cause injury to the marbled murrelets on the Benson Tract. The court laid out its causation analysis: the Benson Tract is occupied and used for nesting by marbled murrelets, the logging operation would eliminate 49 acres of this occupied habitat, and the clearcut would remove nests and prevent returning murrelets from nesting or engaging in other breeding-related activities there. The court also explained how the timber harvest would directly fragment a continuous stand of occupied forest and, using scientific studies, how this fragmentation would foreseeably and negatively impact the murrelets' breeding behaviors.

Even though the district court relied on expert opinions that referred to correlative evidence, the record demonstrates that the experts here specifically explained how and why regional-level studies applied to the Benson Tract. Unlike the cases cited by Scott Timber, in which the plaintiffs solely relied on general scientific studies to establish threats to threatened and endangered species, the district court did not rely solely on Cascadia Wildlands's proffered regional-level evidence to establish causation. *See Bhatti*, 9 F.3d at 166; *Man Against Xtinction v. Comm'r of Me. Dep't of Marine Res.*, 478 F. Supp. 3d 67, 73 (D. Me. 2020). Rather, the court relied on expert opinions that provided extensive evidence demonstrating the direct threat that Scott Timber's proposed timber harvest posed to marbled murrelets that live on and use the Benson Tract.

The record also supports the district court's findings on negative "edge effects" that would result from fragmentation of the forest. Contrary to Scott Timber's claim that the district court made no findings on edge effects or predation,

the district court specifically listed examples of edge effects and found that fragmentation would lead to reduced fecundity and lower nest success. Additionally, experts for both Cascadia Wildlands and Scott Timber discussed studies on edge effects and predation and their application to the Benson Tract. Although Cascadia Wildlands's experts acknowledged that they had not specifically studied or modeled edge effects at the Benson Tract, their testimony supports the district court's inferences that these edge effects would occur because of the Benson Snake project.

We hold that the district court did not err in concluding that Cascadia Wildlands established proximate causation under the ESA.[4]

## CONCLUSION

We uphold the district court's determination that Cascadia Wildlands's notice letter was adequate for the commencement of this citizen suit and that Scott Timber's proposed timber harvest on the Benson Tract would result in "take" of marbled murrelets in violation of the ESA. The permanent injunction stands.

**AFFIRMED.**

---

[4] We need not consider whether the district court correctly held that the evidence was sufficient to support the finding that the proposed timber harvest would "harass" murrelets. *See* 50 C.F.R. § 17.3. Because we do not disturb the factual findings underlying the district court's "harm" determination, which alone is sufficient for the issuance of injunction, we do not reach the court's "harassment" conclusion. *See Marbled Murrelet I*, 83 F.3d at 1068 n.5.